## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF INDIANA
## INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| MELISSA M. PENMAN, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 1:15-cv-00440-TWP-MPB |
| | ) | |
| CAROLYN W. COLVIN, Acting Commissioner | ) | |
| of the Social Security Administration, | ) | |
| | ) | |
| Defendant. | ) | |

## ENTRY ON JUDICIAL REVIEW

Plaintiff, Melissa M. Penman ("Ms. Penman") requests judicial review of the final decision of the Defendant, Carolyn W. Colvin, Acting Commissioner of the Social Security Administration ("Commissioner"), wherein the Commissioner denied her application for Supplemental Security Income ("SSI") under Title II of the Social Security Act. For the reasons stated below, the Court **AFFIRMS** the Commissioner's final decision.

## I.    BACKGROUND

### A.    Procedural Background

Ms. Penman filed a Title II application for a period of disability and disability insurance benefits, alleging a disability onset date beginning December 11, 2005. (Filing No. 12-2 at 12.) The claim was initially denied by the Social Security Administration and upon reconsideration. On July 30, 2012, Ms. Penman filed a timely request for a hearing. *Id.* at 12.

On October 11, 2013, a hearing was held by Administrative Law Judge, Monica LaPolt ("the ALJ"), wherein Ms. Penman appeared and testified. (Filing No. 12-2 at 12.) Also appearing and testifying at the hearing was Gail H. Franklin ("the VE"), an impartial Vocational Expert. *Id.* On December 11, 2013, the ALJ denied Ms. Penman's claim. (Filing 12-2 at 26.) On January 29,

2015, the Appeals Council denied Ms. Penman's request for review of the ALJ's decision, thereby making it the final decision of the Commissioner. (Filing No. 17 at 1.) *See* 20 C.F.R. § 404.981. On March 16, 2015, Ms. Penman filed her appeal to this Court.

**B.    Relevant Medical History**

Ms. Penman was born on October 6, 1976, making her twenty-nine years old on her alleged onset date and thirty-seven years old at the time of her hearing. (Filing No. 12-2 at 72.) Her highest level of education is the tenth grade. Since 1996, Ms. Penman has worked at McDonald's restaurants. At the October 11, 2013 hearing, Ms. Penman testified to working thirty hours a week as a cash register operator at a McDonald's restaurant.

On December 11, 2005, Ms. Penman was shot in her left arm while waiting at a stop light. (Filing No. 17 at 2.) The gunshot injury shattered the bones in her left arm. *Id.* Ms. Penman subsequently underwent three surgeries to repair the damage to her left arm: the first in 2005, the second in March 2006, and the third in May 2006. (Filing No. 19 at 2.)

As a result of this event, Ms. Penman has been diagnosed with post-traumatic stress disorder (PTSD) and depression. (Filing No. 12-8 at 79.) She has flashbacks of the shooting, hypervigilance, sleep disturbances, and fear of going out at night. (Filing No. 12-9 at 3.) She has been prescribed various medications to remedy her PTSD symptoms, including amlodipine, prazosin, Risperdal, Zoloft, and Ibuprofen. (Filing No. 12-9 at 39.)

On January 29, 2007, Ms. Penman began mental health treatment at Midtown Community Mental Health Center. (Filing No. 12-9 at 3.) During her treatment, Ms. Penman reported an incident in 2002 when she was hospitalized for a period of five days as a result of a nervous breakdown. *Id.* at 4. Ms. Penman reported improvement during the course of the treatment, which

included both medication and therapy meetings. *Id.* at 35.   On January 15, 2008, she was discharged from treatment with instructions to return if symptoms of PTSD returned. *Id.*

Ms. Penman went five years without any mental health treatment until October 2, 2012, when she reinitiated mental health services. (Filing No. 12-9 at 36.)  After reporting increased paranoia and not feeling safe leaving the hospital, Ms. Penman was admitted for inpatient treatment at Midtown Community Mental Health Center. *Id.*  She was diagnosed with PTSD, which she reported to be triggered by issues she had with a male cousin who had moved into her home. *Id.* at 37.   In this regard, Ms. Penman reported that her cousin had previously tried to physically assault her. *Id.*  Ms. Penman received medication to treat her increased anxiety, as well as both individualized and group therapy. *Id.* at 39-42.   On October 3, 2012 she was admitted to psychiatry and her medications were changed and adjusted.   On October 12, 2012, Ms. Penman was discharged from inpatient treatment with instructions to continue outpatient treatment including individualized counseling to help her cope with PTSD symptoms. (Filing No. 12-10 at 22.)

On October 2, 2012, an initial evaluation of Ms. Penman's Global Assessment of Functioning ("GAF")[1] was assessed at 30, which indicated that "[b]ehavior is considerably influenced by delusions or hallucinations OR serious impairment, in communication or judgment

---

[1]     The Court notes that the most recent version of the *Diagnostic & Stat. Manual of Mental Disorders* ("DSM"), no longer uses GAF scores. *See* Am. Psychiatric Ass'n, *Diagnostic & Stat. Manual of Mental Disorders*, 16 (5th ed., 2013) ("*DSM-V*").   However, the Court will address this issue because at the time of Ms. Penman's claim the GAF scale was still used. The Social Security Administration and courts within this Circuit have repeatedly opined that a claimant's GAF scores, while used to make treatment decisions, do not directly correlate with the severity requirements of the regulations and that the ALJ is therefore not bound by them when determining disability. *See* Revised Medical Criteria for Evaluating Mental Disorders and Traumatic Brain Injury, 65 Fed. Reg. 50746, at 50764-50765 (2000) ("The GAF scale . . . does not have a direct correlation to the severity requirements in our mental disorders listings"); *Denton v. Astrue*, 596 F.3d 419, 425 (7th Cir. 2010); *Wilkins v. Barnhart*, 69 Fed. App'x 775, 780 (7th Cir. 2003) (unpublished); *Sparks v. Colvin*, 1:14-CV-1519; 2015 WL 3618344, at *6 (S.D. Ind. 2015) ("The [GAF] score has limited value in determining whether a [claimant] can engage in substantial gainful activity.").

(e.g., sometimes incoherent, acts grossly inappropriately, suicidal preoccupation) OR inability to function in almost all areas".  (Filing No. 17 at 6; emphasis in original; Filing No. 12-10 at 31.) However, a later evaluation, on May 27, 2013, indicated that Ms. Penman's GAF was 60, which indicated stability.  (Filing No. 12-2 at 18; Filing No. 12-10 at 45.)  In addition to her mental health issues, Ms. Penman suffers from obesity and also reports not to be able to lift over ten pounds. (Filing No. 12-11 at 18.)

**B.**   **Vocational Expert Testimony**

At the December 11, 2013 hearing, the VE noted that, under the Dictionary of Occupational Titles ("DOT"), Ms. Penman was previously employed as a fast food worker and a retail cashier. The VE explained that both occupations that Ms. Penman previously held were light strength occupations, requiring a specific vocational preparation of two under the DOT.  (Filing No. 12-2 at 62-67.)

The ALJ gave a hypothetical asking the VE to determine if an individual with light range of work, ability to understand simple instructions and ability to carry out supportive lifting with the left hand, could engage in similar work as Ms. Penman's past jobs.  *Id.* at 63-64.  In response, the VE responded that such individual would be able to perform fast food or cashier jobs.  *Id.* at 64.

The ALJ then asked the VE if the individual from the first hypothetical were constrained to sedentary positions only, and therefore could not perform any of Ms. Penman's past jobs, would such an individual have alternative job options.  *Id.* at 64-65.  The VE again answered in the affirmative, and listed three possible occupations for an individual restricted to sedentary light strength positions.  *Id.* at 65.  Specifically, the VE stated that such an individual could find work as a telephone quotation clerk, a document preparer, and a table worker.  *Id.*  Additionally, the ALJ

asked the VE that if the same individual from the second hypothetical were to only be able to occasionally handle items with the upper left extremity, would it restrict the occupational options. *Id.* at 65. The VE responded that the additional restriction would not further limit the individual as long as the individual was right handed. *Id.* at 64-65.

However, in response to further questioning by the ALJ and Ms. Penman's attorney, the VE testified that an individual that needed a five to ten minute break per hour, would miss more than one day per month, and could not concentrate for a period of more than two hours could not sustain gainful and skilled employment. *Id.* at 66-67.

**C.      The ALJ's Decision**

The ALJ first determined that Ms. Penman met the insured status requirements of the Social Security Act through December 31, 2015. ([Filing No. 12-2 at 15](#).) The ALJ then began the five-step disability analysis. At step one, the ALJ found that Ms. Penman had engaged in substantial gainful activity during 2008-2011. *Id.* However, because there was a continuous 12-month period in which Ms. Penman did not engage in substantial gainful activity, the ALJ found it proper to address those periods. *Id.* at 16. At step two, the ALJ found Ms. Penman to have the following severe impairments: left forearm gunshot wound residuals, obesity, and post-traumatic stress disorder. *Id.* At step three, the ALJ concluded that Ms. Penman did not have an impairment or combination of impairments that met or medically equaled one of the Listed Impairments in 20 CFR Part 404, Subpart P, Appendix 1. *Id.* at 18. At step four, the ALJ determined that Ms. Penman had the residual functional capacity ("RFC") to perform a limited range of light work as defined in 20 CFR 404.1567(b). *Id.* at 20. More specifically, the ALJ stated that Ms. Penman had the mental capacity to understand, remember, and follow simple instructions. *Id.* Additionally, the ALJ stated that Ms. Penman could tolerate moderate exposure to cold, and could carry out work-

like tasks with reasonable pace and attention. *Id*. However, the ALJ found that Ms. Penman would be unable to climb ladders, ropes, and scaffolds. *Id.*

Ultimately, the ALJ determined that Ms. Penman was capable of performing past relevant work as a fast food worker. *Id.* at 25. Thus, the ALJ found Ms. Penman to be not disabled. *Id.*

### III. <u>LEGAL STANDARD</u>

### A.   <u>Disability Determination</u>

Under the Social Security Act, a claimant is entitled to SSI if he establishes he has a disability. 42 U.S.C. §§ 423(a)(1)(E), 1382. Disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment . . . which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. §§ 416(i)(1), 423(d)(1)(A), 1382c(a)(3)(A). To justify a finding of disability, a claimant must demonstrate that his physical or mental limitations prevent him from doing not only his previous work but any other kind of gainful employment which exists in the national economy, considering his age, education, and work experience. 42 U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(B).

The Commissioner employs a five-step sequential analysis to determine whether a claimant is disabled. 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4). If disability status can be determined at any step in the sequence, an application will not be reviewed further. *Id*. At step one, if the claimant is engaged in substantial gainful activity, he is not disabled despite his medical condition and other factors. 20 C.F.R. §§ 404.1520(a)(4)(i), 416.920(a)(4)(i). At step two, if the claimant does not have a "severe" impairment that meets the durational requirement, he is not disabled. 20 C.F.R. §§ 404.1520(a)(4)(ii), 416.920(a)(4)(ii). A severe impairment is one that "significantly

limits [a claimant's] physical or mental ability to do basic work activities."   20 C.F.R. §§ 404.1520(c), 416.920(c).

At step three of the sequential analysis, the ALJ must determine whether the claimant's impairment or combination of impairments meets or equals the criteria for any of the conditions included in 20 C.F.R. Part 404, Subpart P, App'x 1 (the "Listings").   20 C.F.R. §§ 404.1520(a)(4)(iii), 416.920(a)(4)(iii).   *See also* 20 C.F.R. Pt. 404, Subpart P, App'x 1.   The Listings are medical conditions defined by criteria that the Social Security Administration has pre-determined to be disabling.   *Barnett v. Barnhart*, 381 F.3d 664, 668 (7th Cir. 2004); 20 C.F.R. §§ 404.1525(a), 416.925(a).   *See also* 20 C.F.R. Pt. 404, Subpart P, App'x 1.   For each Listing, there are objective medical findings and other findings that must be met or medically equaled to satisfy the criteria of that Listing.   20 C.F.R. §§ 404.1525(c)(2)-(5), 416.925(c)(2)-(5).

If the claimant's impairments do not meet or medically equal a Listing, then the ALJ assesses the claimant's residual functional capacity for use at steps four and five.   20 C.F.R. §§ 404.1520(e), 416.920(a)(4)(iv).   Residual functional capacity is the "maximum that a claimant can still do despite his mental and physical limitations."   *Craft v. Astrue*, 539 F.3d 668, 675-76 (7th Cir.  2008); 20 C.F.R. § 404.1545(a)(1); 20 C.F.R. § 416.945(a)(1).

At step four, if the claimant is able to perform his past relevant work, he is not disabled.  20 C.F.R. §§ 404.1520(a)(4)(iv), 416.920(a)(4)(iv).   At step five, the ALJ determines whether the claimant can perform any other work in the relevant economy, given his RFC and considering his age, education, and past work experience.  20 C.F.R.  §§ 404.1520(a)(4)(v), 416.920(a)(4)(v).   *See also* 42 U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(B).   The claimant is not disabled if he can perform any other work in the relevant economy.   42 U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(B).   The combined effect of all of a claimant's impairments shall be considered throughout the disability

determination process.  42 U.S.C. §§ 423(d)(2)(B); 1382c(a)(3)(G).  The burden of proof is on the claimant for the first four steps; it then shifts to the Commissioner at the fifth step.  *Young v. Barnhart*, 362 F.3d 995, 1000 (7th Cir.  2004).

**B.**     **Review of the Commissioner's Final Decision**

When the Appeals Council denies review, the ALJ's ruling becomes the final decision of the Commissioner.  *Liskowitz v. Astrue*, 559 F.3d 736, 739 (7th Cir. 2009); *Hendersen v. Apfel*, 179 F.3d 507, 512 (7th Cir. 1999).  Thereafter, in its review, the district court will affirm the Commissioner's findings of fact if they are supported by substantial evidence. 42 U.S.C. § 405(g)(2012); *Craft*, 539 F.3d at 673; *Dixon v. Massanari*, 270 F.3d 1171, 1176 (7th Cir. 2001).  Substantial evidence consists of "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Dixon*, 270 F.3d at 1176; *Zurawski v. Halter*, 245 F.3d 881, 887 (7th Cir. 2001).  *See also Skinner v. Astrue*, 478 F.3d 836, 841 (7th Cir. 2007) (Substantial evidence must be "more than a scintilla but may be less than a preponderance.").

In this substantial-evidence determination, the court does not decide the facts anew, re-weigh the evidence, resolve conflicts, decide questions of credibility, or substitute the court's own judgment for that of the Commissioner.  *Overman v. Astrue*, 546 F.3d 456, 462 (7th Cir. 2008); *Lopez ex rel. Lopez v. Barnhart*, 336 F.3d 535, 539 (7th Cir. 2003).  Accordingly, if the Commissioner's decision is adequately supported and reasonable minds could differ about the disability status of the claimant, the court must affirm the decision.  *Elder v. Astrue*, 529 F.3d 408, 413 (7th Cir. 2008).

Ultimately, the sufficiency of the ALJ's articulation aids the court in its review of whether the Commissioner's final decision was supported by substantial evidence.  *See Stephens v. Heckler*, 766 F.2d 284, 287-88 (7th Cir. 1985) ("The ALJ's opinion is important not in its own

8

right but because it tells us whether the ALJ has considered all the evidence, as the statute requires him to do."). While, the ALJ need not evaluate every piece of testimony and evidence submitted in writing, the ALJ's decision must, nevertheless, be based upon consideration of all the relevant evidence. *Terry v. Astrue*, 580 F.3d 471, 475 (7th Cir. 2009); *Carlson v. Shalala*, 999 F.2d 180, 181 (7th Cir. 1993). In this vein, the ALJ may not discuss only that evidence that favors his ultimate conclusion but must confront evidence that contradicts his conclusion and explain why the evidence was rejected. *Diaz v. Chater*, 55 F.3d 300, 307 (7th Cir. 1995).

Further, the ALJ's decision must adequately demonstrate the path of reasoning, and the evidence must lead logically to the ALJ's conclusion. *Terry*, 580 F.3d at 475; *Rohan v. Chater*, 98 F.3d 966, 971 (7th Cir. 1996). Indeed, to affirm the Commissioner's final decision, "the ALJ must build an accurate and logical bridge from the evidence to [his] conclusion." *Zurawski*, 245 F.3d at 888–89; *Clifford v. Apfel*, 227 F.3d 863, 872 (7th Cir. 2000).

## IV. DISCUSSION

Ms. Penman raises several challenges to the ALJ's decision. First, she argues the ALJ erred in finding that she did not meet the required criteria for Listing 12.06. (Filing No. 17 at 11.) Second, she argues the ALJ erred by not summoning a medical advisor to testify as to whether her mental and physical impairments medically equaled any Listing, including 12.06. *Id.* at 14. Third, Ms. Penman argues that the ALJ incorrectly assessed her ability to perform her past relevant work of fast food employee. *Id.* at 17.

### A.     The ALJ relied on substantial evidence in determining criteria for Listing 12.06

Ms. Penman argues that the ALJ's determination finding that she does not meet the criteria for Listing 12.06 is not supported by substantial evidence. More specifically, Ms. Penman argues

that the ALJ failed to consider relevant evidence that proved her disability.  The Court is not persuaded and finds the ALJ's decision to be supported by substantial evidence.

A claimant has the initial burden of presenting medical evidence to demonstrate that his impairments satisfy all of the requirements in a Listing.  *Ribaudo v. Barnhart*, 458 F.3d 580, 583 (7th Cir. 2006); *Knox v. Astrue*, 327 Fed. App'x 652, 655 (7th Cir. 2009) (unpublished opinion) ("[a]lthough an ALJ should provide a step-three analysis, a claimant first has the burden to present medical findings that match or equal in severity all the criteria specified by a Listing").  Thereafter, the ALJ also has a duty to mention the specific Listing he is considering and offer more than a perfunctory analysis.  *Ribaudo*, 458 F.3d at 583 (internal quotations omitted); *Barnett*, 381 F.3d at 668.

Listing 12.06 applies when an individual has anxiety related disorders and the anxiety "is either the predominant disturbance or it is experienced if the individual attempts to master symptoms; for example, confronting the dreaded object or situation in a phobic disorder or resisting the obsessions or compulsions in obsessive compulsive disorders."  20 C.F.R. Pt. 404, Subpart P, App'x 1 § 12.06.  To be found disabled under this Listing, Ms. Penman must satisfy the requirements of Subpart A, along with the requirements of either Subpart B or C.  *Id.*

Listing 12.06 indicates that to meet the criteria for Subpart A there must be medically documented findings of at least one of the following:

> 1. Generalized persistent anxiety accompanied by three out of four of the following signs or symptoms: a. Motor tension; or b. Autonomic hyperactivity; or c. Apprehensive expectation; or d. Vigilance and scanning; or 2. A persistent irrational fear of a specific object, activity, or situation which results in a compelling desire to avoid the dreaded object, activity, or situation; or 3. Recurrent severe panic attacks manifested by a sudden unpredictable onset of intense apprehension, fear, terror and sense of impending doom occurring on the average of at least once a week; or 4. Recurrent obsessions or compulsions which are a source of marked distress; or 5. Recurrent and intrusive recollections of a traumatic experience, which are a source of marked distress.

20 C.F.R. Pt. 404, Subpart P, App'x 1 § 12.06(A).

In order to satisfy Subpart B, the Plaintiff must show that her mental impairments resulted in at least two of the following: marked restrictions of activities of daily living; marked difficulties in maintaining social functioning; marked difficulties in maintaining concentration, persistence or pace; or repeated episodes of decompensation, each of extended duration. 20 C.F.R. Pt. 404, Subpart P, App'x 1 § 12.06(B).

In her decision, the ALJ appears to acknowledge that Ms. Penman has the mental impairments necessary to satisfy Subpart A of Listing 12.06, by focusing her analysis, instead, on the Subpart B criteria. In this regard, the ALJ stated that "the claimant's mental impairment does not cause at least two "marked" limitations", which indicates that the issue was not whether the ALJ believed Ms. Penman met Subpart A's diagnostic requirements, but instead Subpart B's severity requirements. (Filing No. 12-2 at 20.) Accordingly, the Court finds the ALJ's Listing determination to be adequately supported and sufficiently articulated.

In regards to Subpart B's requirements for marked restrictions of daily living activities, the ALJ found that Ms. Penman only had mild restrictions. (Filing No. 12-2 at 19.) In support of her finding, the ALJ noted that Ms. Penman had been working full time since 2007 at a McDonald's restaurant. *Id.* At the time of the hearing date, Ms. Penman was still working thirty hours a week at McDonald's. *Id.* Also, the ALJ noted that Ms. Penman was able to drive, attend Bible Study, and keep her medical appointments as indicative of only mild restrictions in daily activities. *Id.* Next, the ALJ found Ms. Penman to have only mild difficulties in the marked difficulties in social functioning part of Subpart B. *Id.* In support, the ALJ indicated that Ms. Penman had a boyfriend and had been able to perform satisfactorily at work. *Id.* Further, the ALJ found Ms. Penman to only have moderate difficulties regarding concentration, persistence, or pace. *Id.* The ALJ cited

11

to medical records which indicated Ms. Penman's ability to concentrate, speak normally, be logical, be organized, and have a good memory. *Id.* Lastly, the ALJ found that Ms. Penman had experienced no episodes of decompensation, which had been of extended duration. *Id.* While the ALJ acknowledged one occasion where Ms. Penman decompensated, the ALJ found that it was not of an extended duration. *Id.* at 20. The Court finds the ALJ's analysis and decision regarding Subpart B's requirements to be well supported by the record evidence and sufficiently explained.

Ms. Penman's most strident argument regarding the ALJ's Listing determination is that the ALJ committed reversible error by mentioning her GAF score of 60, but failing to mention her lower GAF score of 30. (Filing No. 23 at 3; Filing No. 12-10 at 31.) Ms. Penman contends that the ALJ's failure to mention the lower GAF score indicates the ALJ did not rely on substantial evidence in determining if Ms. Penman met the criteria for Listing 12.06. (Filing No. 17 at 12.) In this regard, the Seventh Circuit has stated that "nowhere do the Social Security regulations or case law require an ALJ to determine the extent of an individual's disability based entirely on his GAF score." *Denton*, 596 F.3d at 425. Nonetheless, the Seventh Circuit has also stated that an ALJ is not allowed to "cherry-pick" medical records that support his or her decision, while ignoring evidence favorable to the plaintiff. *Yurt v. Colvin*, 758 F.3d 850, 859 (7th Cir. 2014). The *Yurt* court found it impermissible for an ALJ to cite to the Plaintiff's highest initial GAF score, while ignoring the Plaintiff's *multiple* and *subsequent* lower GAF scores, diagnosed by another physician. *Id. See also Pickett v. Astrue*, No. 1:11-CV-0160-SEB-DML, 2012 WL 4470242 at 6 n.3. (S.D. Ind. Sept. 27 2012) (noting, in a footnote, that "nowhere in the Social Security regulations or case law does it permit an ALJ to ignore low GAF scores while considering other high GAF scores").

The actions of the ALJ in Ms. Penman's case are clearly distinguishable from those requiring remand in the *Yurt* decision.  In *Yurt*, the ALJ ignored the plaintiff's most recent GAF scores which showed a decrease in mental health.  (*Yurt,* 758 F.3d at 859.)  Instead, the ALJ in *Yurt* cited to the plaintiff's highest GAF score ever recorded in order to support her decision and ignored the two *subsequent* lower GAF scores.  *Id.*  Further, the lower GAF scores that the ALJ failed to mention had been assessed by two separate treating physicians.  *Id.*

In contrast, in Ms. Penman's case, the ALJ cited to the most *recent* GAF score on record for Ms. Penman, which also happened to be the highest GAF score of 60.  (Filing No. 12-2 at 24.) While the ALJ did not explicitly mention the lower GAF score of 30, which occurred earlier on October 2, 2012, the ALJ did consider and discuss Ms. Penman's contemporaneous episode of decompensation during which the lower GAF score was assessed.  *Id.* at 19-20.  In her opinion, the ALJ acknowledged that "[a]lthough the claimant did decompensate on one occasion, it was not of an extended duration".  (Filing No. 12-2 at 20.)  It was during this period of decompensation that Ms. Penman's GAF score was evaluated at 30.  (Filing No. 12-10 at 31.)  Further, later in her decision, the ALJ discussed the period of decompensation again.  (Filing No. 12-2 at 24.)  The ALJ's discussion of Ms. Penman's decompensation, along with discussion of other evidence of Ms. Penman's mental health, indicates that the ALJ was not engaged in impermissible cherry-picking of the evidence.  Similar balancing of the evidence was not present in the *Yurt* case. Additionally, the GAF score of 30 that the ALJ did not mention in her decision was assessed by only one physician on one occasion.  (Filing No. 12-10 at 31.)  In contrast, in the *Yurt* case, the ALJ failed to consider two GAF scores assessed by a different physician that assessed the higher GAF score of 60.  *Yurt,* 758 F3.d at 859-860.

13

Because the ALJ's actions in the present matter greatly differ from the ALJ's actions in the *Yurt* case, the ALJ's omission of the GAF score of 30 constitutes, at most, "harmless error". *See Scott v. Astrue*, 730 F. Supp. 2d 918, 935 (C.D. Ill. 2010) ("[h]armless errors are those that do not affect the ALJ's determination that a claimant is not entitled to benefits"); *Sanchez v. Barnhart*, 467 F.3d 1081, 1082-83 (7th Cir. 2006) ("errors if harmless do not require (or indeed permit) the reviewing court to upset the agency's decision"). *See also, Salt River Project Agric. Improvement and Power Dist. v. U.S.*, 762 F.2d 1053, 1060 n. *8 (D.C. Cir. 1985) ("[w]hen it is clear that based on the valid findings the agency would have reached the same ultimate result, we do not improperly invade the administrative province by affirming."); *Scott*, 730 F. Supp. 2d at 935 (C.D. Ill. 2010) ("[h]armless errors are those that do not affect the ALJ's determination that a claimant is not entitled to benefits."); *Sanchez*, 467 F.3d at 1082-83 ("errors if harmless do not require (or indeed permit) the reviewing court to upset the agency's decision"). Moreover, the Commissioner argues that even if the ALJ had included the lower GAF score of 30, it would have only furthered the Commissioner's argument that Ms. Penman had greatly improved, as her most *recent* GAF scores were much higher. As such, the ALJ's failure to mention the low score is not the kind of error that, but for the omission, the agency might have reached a different result.

In addition, Ms. Penman argues that the ALJ failed to consider as evidence of her severe mental impairment the fact that on October 2, 2012, she informed her intake doctors that she was calling her boyfriend over thirty times to make sure he was well. (Filing No. 17 at 11; Filing No. 12-9 at 36.) Ms. Penman argues that her repeated telephone calls to her boyfriend were an indication of her paranoia. (Filing No. 17 at 11.) However, the intake evaluation was conducted during the same period of decompensation that the ALJ discussed in her decision. (Filing No. 12-2 at 19-20.) As such, the Court is not persuaded that the ALJ ignored the evidence. Further, an

ALJ is not required to discuss every piece of evidence presented, as long as the ALJ builds a "logical bridge" between the evidence and his or her conclusion. *Skarbek v. Barnhart*, 390 F.3d 500, 503 (7th Cir. 1997). As discussed previously, the ALJ built a logical bridge, thus, the Court finds that the ALJ's Listing determination was supported by substantial evidence.

**B.**   **The ALJ did not err by failing to obtain an updated medical expert opinion to determine if Ms. Penman's mental-physical impairments equaled any listed impairments.**

The Seventh Circuit has made it clear that an ALJ must consider an expert's opinion when determining whether a claimant's impairment equals a Listing. *Barnett*, 381 F.3d at 670-71 (holding that, because it involves a medical determination, an ALJ is required to consider an expert's opinion when determining whether a claimant's impairment equals a Listing). *See also,* 20 C.F.R. § 404.1526(c) (when considering equivalency with a Listing, the Commissioner "also consider[s] the opinion given by one or more medical or psychological consultants designated by the Commissioner"); S.S.R. 96-6p ("longstanding policy requires that the judgment of a physician (or psychologist) designated by the Commissioner on the issue of equivalence . . . must be received into the record as expert opinion evidence and given appropriate weight.").

Ms. Penman contends that the ALJ was obligated to obtain an updated opinion of a medical expert to determine if her severe impairments medically equaled any listed impairment. She argues that the opinions of the agency physicians were "dated" since they were given in 2012. (Filing No. 17 at 15.) She believes a medical expert should have reviewed her medical treatment of 2013. (*Id.*) However, Ms. Penman fails to cite to any controlling precedent to support her argument.

The Seventh Circuit has repeatedly found that an ALJ does not automatically have to update a medical opinion when there is evidence that post-dates the original. *See Skarbek*, 390 F.3d at 504 (7th Cir. 2004) (stating that an ALJ need recontact a medical source only when the

evidence received is inadequate to determine if the claimant is disabled.); *Buckhanon ex rel. J.H v. Astrue*, 368 F. App'x 674, 679 (7th Cir. 2010) (stating that an ALJ is not compelled by SSR 96-6p to summon a medical expert to assess evidence generated after an initial medical opinion) (unpublished opinion).

These Seventh Circuit decisions are also consistent with the regulation concerning an ALJ's duty regarding medical equivalency, which states that an ALJ must obtain an updated opinion when "additional medical evidence is received that *in the opinion* of the administrative law judge or the Appeals Council may change the State agency medical or psychological consultant's finding that the impairment(s) is not equivalent in severity to any impairment in the Listing of Impairments."  SSR 96-6P (SSA July 2, 1996) (emphasis added).

In Ms. Penman's case the ALJ's decision not to update the medical record is consistent with *Skarbek*, *Buckhanon*, and the language of SSR 96-6p.  For example in *Buckhanon*, the medical opinions stating that the plaintiff's impairments were not medically equivalent to any Listing were provided in 2005.  *Buckhanon*, 368 F. App'x at 679.  Because the ALJ issued his decision in 2007, the plaintiff claimed that the ALJ should have obtained an updated opinion that considered newer evidence.  *Id.*  However, the *Buckhanon* court concluded that there was enough opinion evidence to support the ALJ's findings and the ALJ was within his discretion to not obtain an updated medical opinion.  *Id.*  The *Buckhanon* court stated that the "SSR 96–6p requires an ALJ to secure another expert opinion only when, "in the opinion of the administrative law judge," new evidence might cause the initial opinion to change".  *Id.*

Here, the state physician's opinions pre-dated some of the evidence in the record. However, the ALJ in Ms. Penman's case did not solely rely on the physician's opinions.  The ALJ also considered the other evidence on record such as, Ms. Penman's daily activities, objective

16

medical evidence, and the opinion of Ms. Penman's family physician. (<u>Filing No. 12-2 at 25</u>.) It is apparent that the ALJ did not believe that the new evidence would change the state agency physician's opinion on medical equivalency. The ALJ sufficiently supported her conclusion. (<u>Filing No. 12-2 at 19-20</u>.) As such, the ALJ was within her discretion to not update the medical opinion.

In support of her argument, Ms. Penman also cites to Seventh Circuit cases stating that an ALJ is not allowed to "play doctor". (<u>Filing No. 17 at 15</u>.) *See*, *e.g.*, *Barnett*, 381 F.3d 664 (stating that an ALJ must consider an expert's opinion on the issue of equivalency); *Green v. Apfel,* 204 F.3d 780, 781 (7th Cir. 2000) (stating that a medical expert must testify if necessary to provide an informed basis for disability determination). The Seventh Circuit has found that an ALJ must obtain a medical expert's opinion when deciding a Listing equivalency issue. *Barnett*, 381 F.3d 664; *Green,* 204 F.3d at 781. However, in the cases cited by Ms. Penman, the ALJ failed to summon a medical expert at all. (*Id.*) In contrast, the ALJ in Ms. Penman's case obtained the opinion of two medical experts regarding medical equivalency. (<u>Filing No. 12-2 at 19</u>.) The ALJ also stated additional reasons for not finding a medical equivalency for Ms. Penman. (*Id.*)

Similarly, Ms. Penman supports her argument by citing to *Graves v. Astrue*, 11-cv-249-SEB-DKL, 2012 WL 4019533 (S.D. Ind. Sept. 11, 2012), in which the court cited the language of the SSR 96-6P regulations indicating when an ALJ must update a medical opinion. (<u>Filing No. 17 at 15</u>.) However, in the *Graves* decision, the court found that an updated opinion was necessary because the state physician's opinion was assessed before the only psychological examination was performed. *Graves,* 2012 WL 4019533 at *3. In contrast, in Ms. Penman's case, the state physicians had access to Ms. Penman's previous psychological record. (*See* <u>Filing No. 12-2 at 19</u>.) Thus, the facts in the *Graves* case are distinguished from those in Ms. Penman's case. The

ALJ in Ms. Penman's case did not "play doctor", but instead relied on legitimate and substantial evidence in the record, to determine that Ms. Penman's severe impairments did not medically equal any Listings.

The Court also notes that Ms. Penman does not elaborate on what new evidence needed to be reexamined.  In this vein, the Court notes that it is the burden of the Plaintiff to prove that she meets the criteria of a Listing.  See *Ribaudo*, 458 F.3d at 583. (stating that a claimant first has the burden to present medical findings that match or equal in severity all the criteria specified by a Listing).  Here Ms. Penman did not meet her burden.

In sum, the Court finds that the ALJ supported her medical equivalency decision with substantial evidence in the record and she was within her discretion to not obtain an updated opinion regarding medical equivalency.  The opinions of the state physicians and the record evidence that the ALJ cited to, provide sufficient articulation to build a rational bridge between the evidence and her conclusion.  (Filing No. 12-2 at 19-20.)  Thus, the Court finds no error in the ALJ's decision to not obtain an updated medical opinion.

**C.**      **Substantial evidence supports the ALJ's finding that Ms. Penman could perform her past relevant work.**

Finally, Ms. Penman argues that the ALJ erroneously presented the Vocational Expert with incomplete hypotheticals.  (Filing No. 17 at 17.)  To the extent the ALJ relies on the testimony from a Vocational Expert, the hypothetical question posed to the expert must incorporate all relevant limitations from which the claimant suffers in order to accurately gauge how many jobs are available to the claimant in the national economy.  *Young*, 362 F.3d at 1003.

To begin, the Court notes that the ALJ's hypothetical was a mirror image of his RFC finding.  For instance, the ALJ stated his RFC determination of Ms. Penman as follows,

> I find that the claimant has the residual functional capacity to perform a limited range of light work, as defined in 20 CFR 404.1567(b). The claimant could not climb ladders ropes and scaffolds. She could tolerate no more than moderate exposure to cold.  She has the mental capacity to understand, remember and follow simple instructions.  Within these parameters and in the context of performing simple, routine, repetitive, concrete, tangible tasks, the claimant is able to sustain attention and concentration skills sufficient to carry out work-like tasks with reasonable pace and persistent.

(Filing No. 12-2 at 20.)  By way of comparison, the ALJ's first hypothetical presented to The VE indicated an individual that was,

> capable of the full range of light work with no ladders, ropes, or scaffolding.  Where the left hand can only be used for supportive lifting…no more than moderate exposures to extremes of cold…. And the individual has the mental capacity to understand, remember and follow simple instructions.  Within those parameters and the context to perform simple, routine, repetitive, concrete, tangible tasks, the individual is able to sustain attention and concentration skills sufficient to carry out work-like tasks with reasonable pace and persistent.

(Filing No. 12-2 at 63-64.)

The hypothetical presented by the ALJ is nearly identical to the ALJ's RFC determination. In response to this hypothetical, the Vocational Expert found that an individual with those limitations would be able to work as a fast food worker, cashier, or small product assembler. (Filing No. 12-2 at 64.)   The ALJ then continued with two more hypotheticals, both with limitations greater than the limitations assessed in the ALJ's RFC determination.  *Id.* at 64-66.  In the second hypothetical, the ALJ asked The VE to consider the individual from the first hypothetical to be limited to only sedentary work, and if such individual would be employable.  *Id.* In response, The VE answered in the affirmative and suggested that such an individual could find work as a telephone quotation clerk, document preparer or table worker.  *Id.*  In the third hypothetical, the ALJ added the limitation of only being able to use the left extremity occasionally, to which The VE found would not change her answer to the previous hypothetical.  *Id.* at 65-66.

The hypotheticals are a fair reflection of the ALJ's RFC determination and, as such, the ALJ properly relied on The VE's testimony to determine that Ms. Penman was capable of performing past relevant work as a fast food worker. *See Packham v. Astrue*, 762 F. Supp. 2d 1094, 1097 (N.D. Ill. 2011) (holding valid a hypothetical based upon a valid RFC determination). *See also Sims v. Barnhart*, 309 F.3d 424, 432 (7th Cir. 2002) (noting that an ALJ may properly rely upon a vocational expert's testimony, as long as the ALJ submits a hypothetical that reflects the ALJ's conclusions regarding the extent of the claimant's impairments); *Simila v. Astrue*, 573 F.3d 503, 521 (7th Cir. 2009) (noting that an ALJ is "required only to incorporate into his hypotheticals those impairments and limitations that he accepts as credible").

Rather than challenging the ALJ's hypothetical, it may be that Ms. Penman is actually challenging the ALJ's RFC determination.  In this regard, the Court concludes that the ALJ's RFC decision was substantially supported and adequately articulated.  ([Filing No. 12-2 at 20-25](.))  An ALJ's factual conclusions are entitled to deference as long as they are supported by substantial evidence in the record. *See Elder*, 529 F.3d at 413; *Craft*, 539 F.3d at 673; *Lopez,* 336 F.3d at 539 (stating that in a substantial evidence determination, the court will not reweigh evidence); *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (stating that the court will not overturn an ALJ=s decision where it is supported by such relevant evidence as a reasonable mind might accept as adequate to support a conclusion).

In sum, the Court finds no error in the ALJ's step four determination finding that Ms. Penman was able to perform her past relevant work as a fast food worker.

## V. <u>CONCLUSION</u>

For the reasons stated above, Ms. Penman's request for remand is **DENIED** and the Commissioner's final decision is **AFFIRMED**.  Final judgment will be entered by a separate order.

        **SO ORDERED.**

Date: 6/23/2016

                                       TANYA WALTON PRATT, JUDGE
                                       United States District Court
                                       Southern District of Indiana

DISTRIBUTION:

Patrick Harold Mulvany
patrick@mulvanylaw.com

Kathryn E. Olivier
UNITED STATES ATTORNEY'S OFFICE
kathryn.olivier@usdoj.gov